Good morning, Your Honors. May it please the Court, my name is Alexis Diamond, and I, along with my co-counsel, Isaiah Kossos-Brosky, am appearing on behalf of Petitioner Jose Euceda Hernandez, under the supervision of Professor Andrew Ness. I will be arguing for seven minutes that the BIA erred in dismissing Jose's motion to reopen for lack of jurisdiction, and my co-counsel will be arguing that the BIA erred in interpreting the plain language of 8 CFR 1003.2K. Your Honors, the BIA erred in dismissing Jose's motion to reopen for lack of jurisdiction, where the BIA, in fact, took jurisdiction over the direct appeal, and Congress placed no jurisdictional limits on the BIA's authority to adjudicate such motions. Ms. Diamond, it struck me that regardless of the merits of your present claim, if we grant the petition and vacate and remand with instructions to decide the motion on grounds other than jurisdiction, aren't there so many grounds other than jurisdiction on which to deny the petition of Mr. Euceda? Yes, Your Honor. As to make this ruling really harmless error? Or does harmless error apply here? No, Your Honor. Even in a patently privileged case, the 11th Circuit in an en banc decision this year reversed and remanded a case to the BIA to bring discipline to the use of the word jurisdiction. The BIA cannot use the word jurisdiction when it is actually a claim processing rule. Two years ago, this court in Aragonas-Bionis v. Holder stated that the 30-day appeal filing deadline was a claims processing rule, not a jurisdictional rule. This court reasoned that the BIA was without authority to issue a procedural rule as jurisdictional, where Congress explicitly prescribed it as such. Because exactly like the Supreme Court holding in Sebelius v. Auburn Regional Medical Center this year, administrative agencies cannot independently contract their jurisdiction. Only Congress has that power. And here, the language of the statute for motion to reopen doesn't include any language about jurisdiction and does not. Well, what the BIA was doing puts me in mind a little bit of Marbury v. Madison. This place of filing rule simply says that if the issue was decided by a dismissal based on lack of jurisdiction on timeliness, let's say. Well, yes, the BIA considered that so you can make a motion to reopen or reconsider before the BIA because they considered that issue. They didn't consider the merits of any asylum or hardship or anything else. The people who consider the merits of hardship or asylum or withholding or any other claim for non-deportability was the IJ. And that's more or less what happened in Marbury versus Madison. The statute said you can't you can sue for your commission in the Supreme Court of the United States. And Justice Marshall said, no, you can't. This is a jurisdiction. Isn't that all the BIA is doing here? Just saying sort of dividing up who can sue on what grounds where. And it's a pretty commonsensical dividing up. I mean, they're saying if the BIA has considered only jurisdiction, then bring your motion to reopen and reconsider in the BIA. If you're bringing any other grounds, since the BIA hasn't considered that, bring it in before the IJ. What's wrong with that? Your Honor, the issue is with the BIA's misapprehension of the word jurisdiction. And although it is based on a procedural issue, the BIA cannot claim jurisdiction when Congress has not given the authority within its own regulation. But they have entered an order that simply said, as a matter of claims processing, we direct you to file this in front of the IJ without using the word jurisdiction. Yes, Your Honor. If this case is reversed and remanded to the BIA, the BIA can simply deny the motion to reopen. And this Court, I urge this Court to educate the BIA on using the word jurisdiction in its language when it's actually a claim processing rule. And moreover, the BIA erred in rejecting jurisdiction over Jose's motion to reopen because in its February 3, 2005 decision denying Jose's motion to reopen as untimely, the BIA, in fact, took jurisdiction over Jose's motion. The BIA explicitly held, as the record states on page 26, that we retain jurisdiction over an instant motion to the extent that it challenges the finding of untimeliness or requests consideration of the reasons for untimeliness. Well, untimeliness was the jurisdictional basis, wasn't it, or jurisdictional non-basis? Your Honor, that was the procedural claim processing rule. It wasn't a jurisdictional rule, but the point with the BIA stating such is that jurisdiction vested with the BIA, according to its own regulations, the BIA states that where the case was last heard is where the case should go back once it is heard. That's where the case should go back to. Jose must file with the body who last had the case and rendered a decision. And in 2005, the BIA has rendered a decision. Therefore, this case should be reversed and remanded back to the BIA. By the way, I'm not keeping time on your split. All attorneys have to keep their own time. So don't expect the clerk or me to bring to your attention what your timing is. Counsel, may I ask a question? Does your client have an explanation for why the documents were filed before the BIA instead of before the IJ as ordered? Your Honor, it is not clear within the record, but looking at the motion to reopen and looking at the motion captioned, it was actually addressed to the immigration judge, even though it was submitted to the BIA. Therefore, it strongly suggests that he attempted to file it with the immigration court and was rebuffed, which similarly happened in matter of patina. You argued that? Is that a basis for your claim? Your Honor, it's only a suggestion that that's what was the case, that he tried to submit it to the immigration court because of the caption that was addressed to the immigration judge and immigration court, but it is obviously not within the record. But you're not arguing that in fact he complied with the requirements of the BIA order? Yes, Your Honor. Yes, you are not? I'm not arguing that, yes. All right. Thank you. Yes, as I stated earlier, even in a patently privileged case, there needs to be, if you brought discipline to the word abuse jurisdiction, because it is waved around as if the BIA has jurisdiction over a case, rather as a claim processing rule. And moreover, because the BIA clearly mislabeled the place of its filing rules as jurisdictional, the appropriate remedy is remanded to the agency to correct its misapprehension. Thank you. Good morning, Your Honors. May it please the Court, my name is Isaiah Kostasparovsky, and I also appear as co-counsel for the petitioner, also under the supervision of Professor Andrew Knapp. Your Honors, the BIA also erred in dismissing Hosea's motion to reopen because it improperly and arbitrarily interpreted the plain language of 8 CFR 1003.2a, which plainly and unambiguously gives the BIA authority to reopen any case where it has rendered a decision. Your Honors, although it is true that substantial deference is typically given to agency interpretations of regulations created by enabling statute under the Supreme Court decision of Auer v. Robbins, such interpretation and conduct is only permitted when the language of the regulation is ambiguous. Here in, I think it was in Ladino, the BIA said that it hadn't entered a decision because a dismissal for lack of jurisdiction was not a decision on the merits. Was it incorrect in determining that the word decision does not include a dismissal for lack of jurisdiction? Yes, Your Honor, the position of the petitioner is that Ladino incorrectly interpreted 8 CFR 1003.2a, and in fact, Your Honor, going specifically to that point, that interpretation in Ladino narrowed the plain language of the regulation in question erroneously. First, it doesn't provide or didn't provide a rationale for its distinction between decisions on the merits and procedural defaults, and secondly, it didn't explain why it only applies to cases where the alien's direct appeal was dismissed as untimely, as opposed to any other grounds for a summary dismissal that could be found in 8 CFR 1003.1b2i. Your Excellency, or Your Honor, going back to your question about Ladino, the petitioner invites this Court to reconcile the tension between Ladino and Erdogan, as my co-counsel pointed out, and it's also in the briefs. Specifically, Your Honors, there is a misinterpretation as to the term jurisdiction, and here the BIA in its own cases of matter of Assad and matter of Nevada, it has implicitly recognized its faulty interpretation of jurisdiction or the language of subpoena in question. The lawyer in Briones did not involve 1003.2a, did it? No, Your Honor. No, it did, or no, it didn't? You are correct in your statement, Your Honor. However, it does point out in matter of Assad and matter of Nevada that BIA does actually have jurisdiction. In both those cases, it did use its subpoena powers to hear the case, and thus there is a tension between, again, or there's a tension for BIA using a decision or its term of jurisdiction improperly. And, Your Honors, if Congress had actually wanted to delimit the BIA's jurisdiction with respect to motions to reopen, it wouldn't have used such clear language that states, again, any case where the BIA has rendered a decision. But in the interest of time, and if Your Honors have no further questions, I'd like to reserve the rest of the time for rebuttal. Let me ask you one question. If we reverse and remand and allow the BIA to determine that its place of filing interpretation in Lopez and now is a valid interpretation for purposes of procedural processing of claims, you would have no objection to that? No, Your Honor. No, you wouldn't? No. No, I wouldn't. No. Thank you. I'm just a leading witness. You've got to get up early to keep up. Good morning, Your Honors. May it please the Court. On behalf of the respondent, Attorney General. Take the last question, the last answer that was asked, given by Mr. Acosta-Parofsky. Why not just accept that? Why not just remand and say to the BIA, consider whether you wish to deny or grant the motion to reopen based on your interpretation of 1003.2a as a procedural claims processing rule, rather than use the dread word, quote, jurisdiction, unquote, period. What's wrong with that? The answer is that if there's any error in this case, it's harmless. Because even if the board used that term. Here we go. This is important. This strikes a bell. Where is the case that says that we can disregard an erroneous basis of ruling when the basis is jurisdictional issues we usually review de novo under a harmless error analysis? Well, let me then rephrase the matter. Remand in this case would be futile in any case, even if the petitioner were correct. I guess the answer to my question is none. Well, Your Honor, even if the board used the term jurisdiction incorrectly as a matter of fiction, it's still true that the board has an interpretation of a regulation which is ambiguous, and that interpretation is reasonable. The regulation at issue here is 1003.2a. And this is the place of filing rule which the board created approximately 40 years ago in its decision matter of Mladenao. Counsel, I think you won that point. I think opposing counsel answered my question when I said what if they just entered an order saying as a matter of claims processing, we're directing you to file this in front of the IJ, and she conceded that would have been just fine. And the term jurisdiction is a term of art. We don't just throw it around. So hence, I think Judge Beda's question about isn't that the more straightforward way to go to make sure that we're all clear on who does and does not have jurisdiction? And the claim is handled properly, even though it doesn't look like it's necessarily going to be terribly complicated. That's certainly not the way the panel in Sanchez de Cabeza went just recently when the issue was presented to the court. The exact same facts were presented. It was an untimely appeal and a subsequent motion to reopen. And the court denied the petition for review, concluding that the agency's interpretation of the regulations was reasonable. And so this court should follow. As a claims processing, well, forgive me for interrupting, but you skipped over the important part, which is what order was appealed from in that case. Was it a jurisdictional dispute? It was a similar decision of the Board of Immigration Appeals. Did it use the word jurisdiction? Just to be clear, I'm trying to ask a specific question. I do believe so. However, I can't tell you right now without looking at the exact decision of the board in that case. Because that's really their complaint, as I hear them. That's all they're really complaining about. Well, Your Honors, in this case, the petitioner was told multiple times, go to the IJ. In essence, there was a claims processing rule. And even if the board used the word jurisdiction incorrectly, because in essence it's a mandatory but not jurisdictional claims processing rule, and that is the best way to consider it post-Irigoyen-Brionis. Although the Ninth Circuit certainly had a different opinion of the matter prior to Irigoyen-Brionis. In the early 90s, it issued its decision in D'Cruz, which was later distinguished by the Ninth Circuit. But in any case, D'Cruz says that the 30-day deadline was mandatory and jurisdictional. Is it your argument today that that's binding? No. No, certainly not. Is that just historical reference, or what are you getting at? It's merely to say that the judicial winds have blown in another direction in recent years. But the Ninth Circuit did take a different approach years ago. And so there can be different views on this matter. In any case, Irigoyen-Brionis is the law. And for that reason, it's better to consider it a mandatory but not jurisdictional claims processing rule of the board that a motion to reopen, other than one challenging the timeliness determination of the board, must be filed with the immigration judge. Let me ask you about it. Counsel, let me ask a question about Irigoyen-Brionis. You heard your opposing counsel discuss the same case. Do you and she read, or the other two counsel, do you read that case the same way? Well, Irigoyen-Brionis dealt with a different issue because it dealt with the question of the timeliness of an appeal. And we have a significant distinction to be made here between appeals and motions to reopen. Why? Because an appeal can only be filed with one body, the Board of Immigration Appeals. But a motion to reopen can be filed with two different bodies, the board and the immigration judge. That's not what Section 103.2a talks about. It says the board may at any time reopen or reconsider its own motion. A request to reopen any case in which a decision has been made by the board. There's not a word in there about immigration judge. That's correct. But 1003.23b1 provides that an immigration judge may, upon his or her own motion, or upon the motion of the service or the petitioner, reopen or reconsider any case in which he or she has rendered a decision. So, there is authority within the regulations for the IJ and the board to reopen proceedings. Now, if a petitioner is untimely and has appealed to the board, there's no further avenue for relief. But if the petitioner files a motion to reopen with the board, when the claims processing rule indicates that he should have filed with the immigration judge, he has another avenue for relief. And, in fact, this petitioner still has an avenue for relief, and it's unclear why he hasn't availed himself of that avenue for relief. He could simply file a motion to reopen with the immigration judge and ask the immigration judge to reopen the case sua sponte. He could ask the immigration judge to certify the case to the board sua sponte. Or he could ask the government to join in a motion to reopen. And so, there is a possibility for relief in this case. It's not certain that it would be granted, but unlike an untimely appeal, which was the issue in Aragón and Briones in which the board said, we're sorry, you're too late, you're done, there's nothing left for you to do other than perhaps file a motion to reopen, a motion to reopen is different because here there is another avenue for relief. You mentioned the Sanchez de Cabeza case, and you think it used the term jurisdiction as a basis for its decision. If that's so, let me ask you a couple of questions. Is Sanchez de Cabeza, which I haven't read, a circuit court case? It's an unpublished decision. Therefore, it's not presidential. However, Petitioner Sanchez de Cabeza did seek panel rehearing and rehearing on Bonkin. Both petitions were denied. And so, the matter did go before all of the judges on that issue. And the issue on rehearing was the question of whether 1003.2a is a reasonable interpretation of an ambiguous regulation. All right, but we're not bound in any way by Sanchez de Cabeza. That's correct. That is correct. Your Honors, as mentioned in the brief, 1003.2a provides that the Board may reopen or reconsider at any time a case in which it's rendered a decision. And the regulation is ambiguous because neither the statute nor the regulations define the term decision. In fact, a quick check of Black's Dictionary provides the decision, at least the first definition provided, is a judicial urgency determination after consideration of the facts and the law, which is to suggest that an appeal which is dismissed as untimely is not a decision, or at least it's ambiguous what decision means. In this case, the Board's place of filing rule construes the term decision to mean a decision on the merits rather than the dismissal of an untimely appeal. You think that a dismissal of a complaint with prejudice to state a claim for relief is not a decision? Now you're talking about a different context, right? Yeah, but nobody would consider any facts on a motion to dismiss a complaint, right? Because the facts were all, as alleged in the complaint, taken as true. It's purely a legal issue. It's not a decision. Even if that's true, the fact of the matter is that there is some ambiguity here. So Black's first definition somehow doesn't fit with federal rule of procedure 8? It's merely to suggest that there is some ambiguity here. Not that there's a clear-cut definition one way or the other. In fact, your argument merely suggests that there's a strong point to be made on one side. In any case, Your Honors, the Board's place of filing rule is a reasonable interpretation of an ambiguous regulation and substantial deference, therefore, is warranted to this interpretation. It's neither plainly erroneous nor inconsistent with the regulation itself. And as mentioned, it places no limit on the alien's right to file a motion to reopen rather than to require him to file that motion with the last body which rendered a merits decision in his case. And in this case, the Board properly applied its place of filing rule. Mr. Yusef Hernandez filed an untimely appeal with the Board which was dismissed. He subsequently filed a motion which the Board considered as a motion to reconsider. And then he filed two motions to reopen. After the first motion was filed, the Board clearly explained to him, don't file your motion with us, go ahead and file with the immigration judge. And instead, he went ahead and filed with the Board again. And the Board subsequently dismissed that motion by properly applying its place of filing rule. And for that reason, Respondent asked that this Court deny the petition for review. Thank you very much. Let's move to some rebuttal. Your Honor, two quick points on rebuttal. First, the Respondent did correctly point out that the petitioner was asked to file with the immigration judge. But then pointed out that this case is frivolous and essentially is harmless error. However, even in a patently frivolous case, the Eleventh Circuit earlier this year en banc held that it needed to bring discipline to the word jurisdiction. And this is exactly what this Court has the opportunity to do. And if this Court doesn't bring discipline to the term jurisdiction, this very issue will keep coming up. And second, Your Honor, the Respondent stated that Jose could file with the immigration judge or the immigration judge can sua spontes certify. But under Regulation 1003.23a, the immigration judge has authority, quote, unless jurisdiction has vested with the BIA. And here, jurisdiction did vest with the BIA in 2005 in its decision on Jose's motion to reconsider. Thank you. I'd like to thank counsel for a very assertive and informative presentation. And this matter of Jose Hernandez versus Holder will be submitted. Thank you very much. Judge Baya, before we hear the next case, could I ask your help in having the deputy clerk make a slight adjustment to the camera? The way it's been changed, I cannot see the clock. And the oralist is partially obscured. So if there could be just a very slight adjustment made, that would be great. In other words, we turn it to where it was before, so far as my ability to see the clock. That's the wrong way, I think. OK. Almost, almost. Just a little more. A little more. No, no, the other way. This way. The other way. Turn it counterclockwise. Counterclockwise. There you go. No, a little more. A little more. Don't stop. Stop. Back, back. Tiny bit. No, back, back. Right there. Right there. If you come this way, just this corner this way, I can see what Judge Joe Scanlon's looking at. No, no, no. Madam Clerk, if you look at me, I'll show you. This corner comes towards me. There, stop. Stop. Stop there. Perfect, perfect. OK, now, and the other is adjusted, too. Thank you very much. I appreciate that. See the little box that shows what Judge Joe Scanlon's looking at? There you go. Yeah. All right. The next case is standard drywall versus NLRB. And it will be argued at the same time. The two operative plaster and cement medicine versus NLRB cases. I have a communication from counsel from the NLRB. Breaking down the minutes will be allocated to each of the parties. I'd like to tell the parties that this court will not keep those minutes. If you I mean, the minutes are broken down 15, 5, 16 and 4. And we're really we don't have whistles like referees to stop you. And so if you really want to break it down that carefully and in that order, it's up to counsel to keep an eye on the clock and. Blow the whistle and get counsel to keep quiet and take place. You follow me. All right. All right. So I think it's. The appellant here are the plaster. So you're going to go first. And the plaster is an unpronounceable acronym. Mia, you know, just call it plasterers and carpenters. That way we'll all know what's going on. All right. So you're you're the plasterers and you're Mr. Bullock. Yeah. All right. So why don't we proceed with the oral argument with a plaster is going first. Oh, did you see. Do you think you see different than this? Right. I see. So I see. Senator Drywall's employer. So. OK. Well, then do you see any problem with letting Senator Drywall go first and then you go afterwards? I don't. I have more issues. He does. Do you see this? Are you following plus standard drywall? And before Mr. Because what we're doing, if we do that, is casting the plasterers in the in the role of an appellee rather than appellant. Your Honor. Well, when I was at the bar, I always like to take second position. If somebody else wanted to make a mistake first, I was ready to do that. You don't have any objection to that, do you, Mr. Bullock? OK, go ahead. My name is Martin Bennett and I represent the drywall. This is my partner. I am both a petitioner and an intervener. And the way we divide it is because in one sense, I am. I have a captive order in some way. We split it up the way we did so that Mr. Bullock would go first. And I would then put my address in for five, five minutes. Then this would respond. But I, as intervener, get four minutes. Well, let me put it even more simply, if you've already agreed on the order of argument, why don't we stick to that? You agree. I proceed. There's actually papers in the prior. OK. So it's just up front. I know I understand. I'm the one starting the clock. But I will be taking 15 minutes, reserving five for rebuttal, and I'll do my best to watch it. Judge, could I ask counsel to move the mic slightly closer to him? I'm having a little difficulty hearing him. OK. Is this better, Your Honor? That's much better. Thank you very much. Perfect. Good morning. May it please the Court, my name is Keith Bullock. I am counsel for the Operative Plasters and Cement Masons International Association and Plasters Local 200. The unions are the petitioners in Case 12-70139 and cross-respondents in Case 12-70379. Both cases involve two decisions issued by the National Labor Relations Board. The first decision is a jurisdictional award issued under Section 10-K of the National Labor Relations Act. The parties commonly refer to that decision as SDI 2. The second decision is an unfair labor practice decision issued by the Board pursuant to Section 8B-4D of the Act, and the parties commonly refer to that decision as SDI 3. The union's petition for review raises several issues, but I wanted to focus today on one issue that is important to any decision, and that is jurisdiction. And more specifically, that the Board lacked jurisdiction to issue the award in SDI 2. Now, as a background, there are three prerequisites the Board must find before it can issue an award. First is that there are competing claims by two groups of employees. Second, that one of those groups uses prescribed means in furtherance of their claim. And three, that there is an absence of an agreed-upon method for the voluntary adjustment of the dispute. And I want to focus on the first and the third, because with respect to the first, substantial evidence does not support the Board's findings that Plasterers Local 200 had a competing claim to the work in dispute. And the work in dispute in SDI 2 was all plastering work at all public works projects assigned by standard drywall in 12 Southern California counties. The second point is that the Board's findings with respect to agreed-upon methods are arbitrary and capricious and contrary to the statute. Now, I want to start with the competing claims. And the Board makes two factual findings. I'm going to start with the second one first. That was that Patrick Finley made an offer to withdraw the Pullen lawsuit, which is a state court lawsuit alleging violations of California's apprenticeship laws, evaluation laws, if standard drywall signed an agreement covering Southern California. Just so the record's clear, Patrick Finley has some association with Plasterers. Well, that's my next point. But the fact is the record shows that Patrick Finley is the general secretary treasurer of the Plasterers International. He has no affiliation with the Plasterers Local. So, counsel, we're talking about a finding of fact. Yes, we are. And what's the appropriate standard review for it? Substantial evidence, your honor. With regards to what Mr. Finley says, when you take the substantial evidence standard and you look at what's in the record, both what the Board relied on, which was the testimony of the vice president, Blaine Kaya, and what else was in the record, you get a completely different picture. The meeting between Mr. Kaya and Mr. Finley took place in Las Vegas. Mr. Kaya testified the meeting was to sign a collective bargaining agreement for Southern Nevada. Mr. Finley was accompanied not by a Local 200 representative, but by a local union representative from Southern Nevada, Local 797. Excuse me for interrupting, but I want to make sure you get a chance to answer my question. And about this part of your brief, or I should say brief because this appears in several of the briefs, but I think you're right about the standard. And it strikes me that because we're in the appellate court and because there's evidence going both ways, that what your briefs were arguing to me, and I think what you're arguing now, is that you think a different decision, a different finding of fact ought to have been made. But we're really looking to see whether there is substantial evidence to support the finding. So why was there error? Well, our argument is that there really is only one finding. It's the exact opposite of what the Board made. And this goes to what Mr. Kaya actually testified. You mean your position is only one finding could have been made? Yes. What do you mean by that? Only one finding could have been made. All right. And it was the opposite of what the Board made. Mr. Kaya, and this goes to Mr. Kaya's own testimony, which is at page 563 and 564 of the appendix, or the excerpts of records, where he testified, quote, when we were discussing and negotiating the Las Vegas agreement, I basically asked them to drop all lawsuits and all the kinds of complaints we had in California, and I would sign it in Vegas, end quote, to which Mr. Finley said he would try. The evidence shows that the discussion of dropping the lawsuit was with respect to Southern Nevada, not Southern California. Now, there's another finding that the Board makes with respect to the claim. Couldn't you just say that Kaya, is this Kaya? Kaya, Floyd and Kaya. Asked to drop all lawsuits in California? His offer was if you drop all lawsuits in California, I'll sign in Nevada. So, and when Finley said I will try, is that evidence that Finley would try to drop the lawsuits in California? That's not evidence in support of a continuing claim to work in Southern California. Well, that depends on what the lawsuits are seeking. If Mr. Finley said I would drop the lawsuit if you sign an agreement in Southern California, that's evidence of a competing claim to work in Southern California. No, no. You're parsing it too finely. Here are two men in Nevada, in Las Vegas, trying to make a deal. And Kaya says, I'll sign if you get rid of the lawsuits in California. And Finley says, I'll try to do that. Now, doesn't that mean the Pullen lawsuit? No. No reasonable person could find that that meant the Pullen lawsuit? Well, no reasonable person could find an offer to withdraw a Pullen lawsuit in return for work in Nevada constitutes a claim for work in Southern California. Well, but the Pullen lawsuit was work in Southern California, right? Well, that's because it was a state law regarding the appointment and payment plan. In California. Why can't we take the Pullen lawsuit as such as the grounds to establish that there was a disputed claim for work? That's my second point. And the reason is that a claim that an employer has to comply with state law with regards to the employment of apprentices is far different than a claim that all work in dispute should be assigned to a particular union. The Pullen lawsuit addresses only apprentices. But one does not plaster buildings by apprentices alone. There are journeymen who perform work. And the ratio in the Pullen lawsuit noted that it's one apprentice hour for every five journeymen. There is no claim with respect to journeymen in the Pullen lawsuit. But it is a claim really quintessentially about use of the apprentices. And opposing counsel's argument that they've made in the briefing anyway, unless it's going to change today, I understand their argument to be that your client is the one that would have the apprentice training program. Those were your folks. You were demanding to get that work, right? At that time. That's correct. But what the lawsuit didn't say is that the local union should be the one representing those employees. And the evidence shows that Standard Drawable in the past used the program, got apprentices, and even in a couple instances noted that the apprentices would be represented by the carpenters as opposed to the plasters. And there was no objection. When you're talking about a jurisdictional dispute, it's a question of two groups of employees seeking work in dispute. And in this case, you have a group represented by the carpenters and a group represented by the plasters. There's no claim by the plasters that they should be representing the employees performing the work. All they're saying is that the apprentices should be referred from the apprenticeship program. They then work under whatever terms that Standard Drawable has agreed to with the carpenters. So I understand your answer to Judge O'Scanlan's question to be that the Pullen lawsuit isn't sufficient, isn't substantial evidence because it didn't allege that, and your clients weren't asserting, that the apprentices would have to be represented by the plasters. That's correct. And, in fact, they testified to that at the 10K hearing. But the board never addressed that issue in the underlying award. Now, finally, I see I have a minute left. So I wanted just to touch on the agreed-upon method. It's our argument, generally speaking, that the statement by Mr. Finley and that the lawsuit do not constitute a claim. So, therefore, there's no claim to 97 projects throughout Southern California. But there is a claim to three projects. And that was evidenced by the complaint that was filed with the plan for the settlement of jurisdictional disputes in the construction industry. Those three projects arose under the Los Angeles Unified School District project stabilization agreement. That agreement had a plan to resolve jurisdictional disputes. The board has always held that when all parties are bound to a plan, that the board will withhold jurisdiction. In fact, it says it's barred. Right. We understand that. And the argument is it didn't cover all of the 97 disputes. So do you want to get to that point? Well, our argument is that Congress has always said the private plan trumps the board. And the board has previously found that even when the plan does not cover the entire dispute, such as the former local 761 case, that they will bifurcate from the part that is covered out and leave the rest to be decided. I am now at ten minutes, so I will stop the slide. Thank you. May it please the Court, my name is Mark Bennett. I represent the petitioner and the intervener standard drywall, as does my partner, Steve Schultz, who is also at counsel's table. The five minutes I'm going to spend here is to discuss why we feel that the board should have issued a broad order in the first standard drywall case. But before I do that, I want to clarify what I think is a liberty that's been taken by counsel on the record with respect to the agreed upon method. The heat claims was agreed to by standard drywall on these three projects. The record does not show, the record in this case relies upon Exhibit 16 in the second 10K hearing, which is standard drywall two. That exhibit came, there were four days of hearing, April 25, May 24, May 25, May 26. That exhibit came in on May 26. The testimony that he refers to regarding standard drain tire and the project stabilization was on April 24 and May 20, April 25 and May 24. He never talked about the only agreement that's in this record. So, Mr. Bennett, the plan or the PSA was signed by all parties here, correct? That's not correct. Why is it incorrect? Standard drywall never signed it. Isn't it part of the employer group, the Southern California Construction Council? He's a member of the Southern California Construction Council. So he wasn't bound by the PSA. I found the PSA based on the record that was in the standard drywall two. Okay. Keep in mind, the letters of assent that are referred to with the breach are not in the record. They are not in the record in standard drywall two. However, you did have a collective bargaining agreement with the carpenters, which did provide for an arbitration before the joint board. For the joint adjustment board, which is a separate arbitration procedure. All right. So now tell me if you would. If the arbitration had proceeded according to the PSA, the plan to which you say your client was not a signatory and was not bound, what would have been the arbitration entity that would have determined that arbitration? Under the plan? Yes. It's plan arbitrators. They were in this case. It was arbitrators. Kelly and arbitrators. Greenberg. All right. They're in Washington, D.C. They're appointed by the plan. All right. And if you use your collective bargaining contract with the carpenters, what is the entity that does the arbitration? In that case, it would it would most likely have been assigned to arbitrator. Lewis is ignorant. Who is the generally the arbitrator? Here's the here's disputes under the joint adjustment. It would be the joint adjustment board for the drywall industry. Well, it would be the joint adjustment board under the collective bargaining agreement between the standard drywall and the carpenters. All right. And that's it. And the plasters are not bound to that plan. All right. Thank you very much. And that's what I thought. And to summarize, we think that a broad order should have should have issued in this case. And in the first case, because of the egregious and widespread actions by the plasterers after the standard drywall decision came out, and things that occurred after the standard drywall decision came out was, the plasterers proceeded with the plan to force the plan awards. They asked for another plan proceeding to cover all of Southern California, even though there was no evidence that standard drywall was bound to that. There was a plan for covering Southern California. They amended the pooling complaint to allege that we had to use local 200 plasters. And if you look at the various versions of the pooling complaint, the pooling complaint alleges that all of the premises are local 200 members, that they're represented by local 200, that local 200 is the one who's going to finance it, that that's all in the pooling complaint, the various versions of the complaint that are in the record. Mr. Bennett, where does the fiber board case fit in this issue? I mean, I've heard of fiber board, but I don't know how you think you're on to things that might apply. Well, I just wondered if you had a comment. Okay, thank you. And it's not been raised, so I don't see that it's been an issue. Counsel, this is an abusive discretion standard, right? Yes. Why was it an abusive discretion for the board to enter the remedial order it entered? Because the evidence of the case is so overwhelming that the union was engaged in egregious and widespread unfair labor practices. They would not stop. The conclusion is that it was not an abusive discretion, correct? The NLRB views its discretion by not entering the broader order. The broader order. Yes, in the first case. We have no problem with the order that was entered in the second case. Good morning, Your Honors. Julie Bordeaux for the National Labor Relations Board. If I could, I'd like to take a second and step back to look at the big picture, because at first blush, these cases may seem rather complicated factually, but there's a fundamental principle at stake, and that is that Congress made Section 10K of the Act and the proceedings implemented under Section 10K to be the final and binding method of resolving disputes between competing unions, jurisdictional disputes for work. In this case, the board issued two such awards, the first covering a project at Cal State Fullerton, and the second covering a broad 12-county area in Southern California consisting of 97 projects. And that, as soon as the board issued particularly the second 10K decision in December 2006, the plasterers, as the board found, violated Section 8B42D of the Act by continuing to process not only the Pullen lawsuit, but also the tortious interference lawsuit, which directly contravened particularly the second 10K award, and to pursue multiple grievances to ask the plan in January 2007 to pursue work that the board had awarded to the carpenters throughout the 12-county area. And that is really the principle at stake. It's the primacy. Once the board has issued a Section 10K award, it is supposed to resolve these disputes so that the employer is not caught in the crosshairs and there is no longer a disruption to commerce. And that's the principle at stake. Another principle at stake is the board shouldn't assume jurisdiction and shouldn't get involved with determining jurisdictional disputes among competing labor unions. If there is a voluntary method of agreement between the parties, and the claim is by the plasterers that there was such an agreement and they should have proceeded under the plan of the PSA,  Certainly, Your Honor. It is true that for the board to invoke a Section 10K proceeding, it must have a reasonable cause to believe that certain threshold conditions exist. One of them is that the unions have competing claims to the work, and another one is that there is no voluntary method to adjust the parties' dispute. And the fundamental flaw in the plasterer's argument is that particularly the second Section 10K dispute concerned 97 job sites throughout a 12-county area. The plasterer is only claiming that three of those 97 disputes are covered by their plan. Their plan is pursuant to the Los Angeles Unified School District Project. His argument is that they should have been bifurcated. What's your response to that? That it would not resolve-the board did not have to and appropriately exercise its discretion in not bifurcating the proceeding. And that makes complete sense because it would not have-splitting all three of them would not have resolved the overall dispute, which concerned 97 job sites, and is continuing to this day with the different-the Poland lawsuit and the tortious interference lawsuit. Did the board rely on a finding-did the board make a finding that the carpenters were bound to an alternative dispute resolution process? Well, what the- The standard eyewall. The board's finding-the board did note that there appeared to be another dispute resolution mechanism, namely the joint adjustment board. But the essential finding of the board is that the-it didn't need to resolve whether the parties were bound to the plasterer's plan at the three sites because in any event, that would not have resolved the parties' far-far reaching, far ranging overall dispute at 97 sites. I'm sorry, is the answer to my question no? The board did not make a finding about the other-what if standard drywall was bound to a different- I guess you could call it-you could call it dicta because the board did note in any event that there appeared to be a competing forum. And- But you don't think the board relied on that? Well, the essential finding is that there was-the board had reasonable cause to believe that there was no private dispute resolution mechanism that would have resolved the overall dispute at issue in the second 10K case. What's the strongest support for the finding that there was-there were claims-competing claims for the work? Well, as regarding-would you like me to start with the first 10K case? Because with regard to that one, the pull-in from local 200 admitted that he would try to get the pull-in lawsuit dismissed in return for assignment of the work. So, that's clear. Yes, that's very strong. And it has to be recalled that the board only had to have reasonable cause to believe that there were competing claims. And so, it's really even more deferential standard of review than substantial evidence. Because now, at the appellate level, the issue is did the board abuse its discretion in finding reasonable cause to believe there were competing claims. Because, again, it goes to-once the 10K proceedings is invoked and an award is made, the purpose of it is to essentially provide labor peace. For better or for worse, one union is going to be the winner and the other is going to be the loser. But the overall goal of labor peace is achieved. And if you turn to the second Section 10 case, Your Honor asked about the strongest evidence that the Plasters were claiming the work. It's the pull-in lawsuit on its face, which was seeking an injunction and damages, essentially requiring the company, Standard Drywall, to use the Plasters' apprenticeship program in 12 Southern California counties. Mr. Bowler just told us that that claim did not require the apprentices of SDI, Standard Drywall, to join the Plasters' union and that in prior years, similar claims had resulted in members of the carpenters' union working through the apprenticeship program of the Plasters' union. Is that representation somewhat inaccurate? I think it is, Your Honor. In fact, Pullen, in his testimony, admitted that those apprentices would be represented by local 200 citations. I believe it's I don't have my brief up here, but I believe it's E.R. It's in our supplemental excerpts of records very early on. Actually, pages one to two. One to two of the supplemental? Of the Board's supplemental excerpts of records. Mr. Bennett asked whether employees dispatched by local 200 hiring hall, are they represented by local 200? And Pullen answered yes. And plus, the lawsuit on its face says that local 200 is seeking to work for its apprentices, for the apprenticeship program that it operates, which happens to be or happened to be the only one in Southern California. So, it follows that the work would go to its apprentices. You mean it isn't possible for a workman who is employed by Standard Drywall to enroll in the Plasters' program, apprenticeship program, and go to work for Standard Drywall and maintain his affiliation with the carpenters? Well, I suppose it's possible for an employee to maintain a dual membership. Well, that's his argument. His argument is that the Plasters' apprentice program could have produced folks represented ultimately by the carpenters. Did you want to respond to that? Well, but they would have had to also have been members of and represented by local 200. They could have had a membership in another labor union. Why? Isn't an apprenticeship program that they teach? I mean, an apprenticeship program means to me they teach people how to do the work. But why does going to school mean that you have to become a union member? Because once those apprentices were, the objective of the Pullen lawsuit was to have apprentices represented by local 200 employed by Standard Drywall. And your citation of pages one and two was that Mr. Pullen said that whoever was dispatched from the apprenticeship program to do work for an employer would be a member of the Plasters? Right, would be represented by the Plasters. And just the overall gist of the lawsuit on its face is seeking that work. And then, of course, you have the testimony of Mr. Kaya. Now, the board doesn't resolve credibility, make credibility resolutions in Section 10K proceedings. But there is certainly reasonable cause to believe that based on the Pullen lawsuit and the testimony of Mr. Kaya that the Plasters were making a claim to this work. And I guess I would like to take a second to respond to Standard Drywall's challenge to the board's remedial order in this case by noting that the very next day the board issued its order in the last Standard Drywall case, which concerned yet another set of grievances that the international took to arbitration on behalf of the local for yet more work that was covered by the second Section 10K case. And in that case, the board issued an even broader remedial order than Standard Drywall had requested in the case that we're arguing now. Does the court have no further questions? All right. No questions. Thank you. No questions. Mr. Bennett, as to your claim that the first order was not broad enough, if Ms. Broido is correct and the second order was broad enough and was issued the next day, what sort of relief are you asking from us? My concern, Your Honor, is that there is a Plaster's asking to return the first case. And if that were to happen, the second case, which is Standard Drywall 4, if that were to happen, then there would not be a broad order. So long as the NLRB order in the second case is affirmed, then you're at peace with the first order. I would be. I would be. I would be. I was given four minutes to respond, and I'd like to address a couple of issues that were asked of Ms. Broido. And that is about the plan. If you look at the testimony in Standard Drywall 2, you have to take into consideration in evaluating that issue that the carpenters, even though they had signed a version of the PSA, the carpenters were taking the position they were not bound to use the plan because at the time that they signed it, they were a member of the Building and Construction Trades Council. And at the time of this dispute, they were no longer a member of the Building and Construction Trades Council. They said, we don't have to go to the plan. That was an issue. So there was a dispute out there. Even the carpenters were claiming they didn't need to go to the plan. But what the board did in that case is they gave the Plaster's the benefit of the doubt, despite the miserable record that was formed in the second 10-K. Gave them the benefit of the doubt, and they said, what is this dispute? It's not a dispute about three projects. It's an area-wide dispute. We have to resolve the dispute. And so they said, so we're going to resolve it. We're not going to bifurcate it. And they cited a case, Spade-Preet, which is exactly what happened. And then the other thing they said, the other round that they said was, there are potentially competing claims here, potentially conflicting awards. The carpenters could get an award. The Plaster's could get an award. It's potentially conflicting. We wouldn't resolve it. Congress charged the board with deciding this dispute quickly and finally. But I asked counsel that question, and she responded that the board did not rely upon the risk of conflicting resolutions, but instead they sort of made the observation and just put it up. No, Your Honor, they did. They looked at both of those issues. They said, number one, there's only three plans that would leave 97 unresolved. And then they said there's also potentially conflicting decisions. And your interpretation is the order is that they relied on both. It's in standard drywall, too. All right. It would be on page, it's 348 NLRB on page 1254. I'm looking at page 1254. And that's ER 47. Yep. They cite the Kenneth Post case. It says, here's the out quote. Here, assuming arguendo the PSA resolves the jurisdictional dispute of three of the projects, this would leave 94 projects unresolved. Further, as described above, the employers presented evidence that both its master agreement and memorandum agreement with the carpenters provides for arbitration of jurisdictional disputes. This could result in conflicting awards binding on the employer. And I note that in their opening brief, Ploster did not take issue with that particular ruling by the board. Okay. So your answer to my question is the board relied on both? Both ways. Yep. Because what the board says, somebody's got to resolve the dispute. I understand. Thank you. Okay. I will try to address all the points that were raised. First, with respect to the project stabilization agreements, there is evidence in SDI, too, that standard drywall signed letters of assent. The agreement itself is in the record. The agreement states that employers become bound to projects on a project-by-project basis. They sign letters of assent for each project. They're required to sign them either the time they're awarded the work or 48 hours before they begin work. The vice president testified that he signed two letters of agreement. They were for the first two projects, the high school number two and East Valley Middle School. There was no testimony about the third one, which was the LAUSD Cal Transit project, because that one hadn't started yet. So under the terms of the project stabilization agreement, they could wait until 48 hours prior to the start of work and sign the letter of assent. What about citations? The citations for when they sign the letters of assent, they are in Volume 3 of our Executive Record, pages 451, 453, and 455. That is with regard to the number two project. Mr. Bullock, if standard drywall for some reason refused to sign any letters of assent following the three projects of which you referred to, what would be the remedy of plasterers? Well, there wouldn't be a remedy because they wouldn't be allowed to perform work on the project. Who wouldn't be allowed to perform work? Standard drywall. Because the employer, in other words the owners, LASUD, would not employ them. Yes. The project stabilization agreement says that in order to perform work, you must sign a letter of assent. If you don't sign a letter of assent, you can't work. Okay. So that's the basis of your saying the standard drywall is bound by the PSA. Yes. You can make a reasonable conclusion. As to work for the LAUSD. Agreement, yes. What about the other 12 counties? Well, it would only apply because the work is under the Los Angeles Unified School District Project Stabilization Agreement. So if they're doing work for the University of California, it doesn't apply there. But if they're doing work for the high school number 15, then it would apply there. This is the rest of the record sites for the East Valley Middle School. It's page 461 and 462. And with regards to the Caltrans Shop 7, the site that the project hadn't started is page 551. Now, with regards to the lawsuit, it was my contention that there's not. Pull-in lawsuit? The pull-in lawsuit, yes. It was my contention that there's nothing in the lawsuit that required standard drywall to recognize level 200 with respect to apprentices who were referred out to the job site. Unions get recognition only by two means. That's a board election or voluntary recognition. It's under section 9. The plasters, admittedly, don't have either. So at page 589, Mr. Pull-in was asked the following question. Does Plastered Local 200 seek to act as a collective bargaining representative for apprentices, plastering apprentices employed by standard drywall? The answer is no. Local 200 was simply trying to make sure that standard drywall adhered to its obligations under the law. It was not trying to force standard drywall to reassign all plastering work throughout 12 counties to Local 200 apprentices. Because the plastering work goes beyond just apprentices. It's journeymen. There's no claim with regards to journeymen there. Now, the one last thing I want to ask, as to whether they were trying to force that or not, isn't that a question of fact that we review for substantial evidence? I mean, can't the National Labor Relations Board say the pressure brought by the pollen lawsuit as to apprentices was for the purpose of having standard drywall recognized plasters as to journeymen as well as apprentices? Perhaps they could. I don't think they did that. Well, I thought they did. Now, what they said was that in the first decision, SDI-1. Reasonable cause to believe that there was pressure brought. Well, there was reasonable cause to believe that the local had a competing claim. That competing claim was the lawsuit. And the competing claim was not only to apprenticeship work, but it's to journeymen's work. Well, there's no evidence of a competing claim that the journeymen's work. The lawsuit doesn't address journeymen's work. And there's nothing in the record that shows that local 200 ever stopped journeymen's work. Thank you, Your Honor. All right. Have we exhausted the time allocated to parties? I don't want to have anybody complain later. All right. Thank you very much. Thank you for a very illuminating argument. And this case, these cases will stand submitted. Thank you very much.
judges: O'scannlain, Bea, Christen